UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 09-CR-10296-RGS

UNITED STATES OF AMERICA

v.

NATHAN BRADSHAW

FINDINGS OF FACT AND
RULINGS OF LAW ON DEFENDANT'S
MOTION TO SUPPRESS

March 22, 2011

STEARNS, D.J.

The following is the edited transcript of the court's oral findings and rulings rendered at the February 25, 2001 final hearing (with citations to cases). For the reasons stated, I will deny Mr. Bradshaw's motion to suppress the firearm and his statements to police.

THE COURT: I will orally dictate my Findings of Facts and Rulings of Law. I intend to order a transcript and I reserve the right to edit it. Also, as I allude to cases, rather than read the citations into the record, I will incorporate them once the transcript is received.

This is by no means an open and shut case, as I think Mr. Wortmann sincerely believes it to be, but I agree with him that on this record I must deny the motion to

suppress both the physical evidence, that is, the gun, and the two statements of Mr. Bradshaw that are at issue. I will explain the findings that lead me to that conclusion.

First, as a general matter, I find that Officers Griffin and Ross are experienced police officers; I believe 9 years at the time of this incident in Griffin's case; 12 in the case of Ross.

Officer Griffin in particular was fully versed in street gang rivalries and gang territorial claims in the Dorchester/Mattapan area. He knew Mr. Bradshaw well – I do not think that is contested. He knew him not simply as a suspected member of the Lucerne Street gang, but as an actual member; and he knew that Mr. Bradshaw had been the target of two prior gang-related shootings, the most recent of which explained his partial paralysis and his need at the time of the stop and frisk to use a crutch or crutches while walking.

I also give some weight, although not extensive weight, to the specialized training that Griffin and Ross had received from ATF on the characteristic traits of persons carrying awkwardly concealed weapons. I have heard similar testimony about this training from other officers. I am not fully familiar with the exact content of the training, but because it is a federally-sanctioned training course offered to local police departments who seem enthusiastic about it, I give it some weight.

There is another important detail in Officer Griffin's testimony – he was familiar

with Mr. Bradshaw's criminal record. It is true that Mr. Bradshaw seems as often to have been the victim of a crime as he was its perpetrator, but the record includes at least two incidents of violent conduct on his part ; one occurring, granted, when he was a juvenile, in the form of threats against, not Officers Griffin or Ross, but another police officer, and a more recent involvement by Mr. Bradshaw in a physical assault.

So now we are at 11:40 p.m., which is late even on an August day, and we have the Boston police officers in an unmarked cruiser accompanied by Richardson, a state trooper, who, because he was not in a position to observe anything relevant for our purposes, did not testify at the evidentiary hearing.

We have the three officers in an unmarked cruiser on Middleton Street. They are present as part of, as Ms. Hedges acknowledges, a justified saturation campaign seeking to prevent any escalation of retaliatory shootings or other violence between the warring Lucerne Street and Norfolk Street gangs.

It is undisputed that there had been three gang-related shootings in the vicinity of Lucerne and Norfolk Streets during the seven days preceding the encounter with Mr. Bradshaw.

The most significant fact is that the officers observed Mr. Bradshaw walking by himself with a single crutch in ostensibly unfriendly territory. There is an explanation why Mr. Bradshaw was using but a single crutch, but Griffin had not seen him before

3

without either a wheelchair or using two crutches.

I do not think it was incumbent upon Officer Griffin to guess at the progress of Mr. Bradshaw's physical therapy and to come to the surmise that perhaps he had reached the point where he was comfortable ambulating with just one crutch. I think it reasonable that Griffin thought that the use of a single crutch was unusual, particularly in light of Mr. Bradshaw's odd positioning of his right arm as if it were fastened to his side. In light of Griffin's experience and training, as was also true of Ross, this was consistent with a person attempting to protect a heavy concealed weapon.

At that point, Griffin hailed Mr. Bradshaw; it may well have been with the nickname "Hit Man" that Mr. Bradshaw considered annoying, and then asked him: "What's up, Nathan?"

Uncharacteristically, Mr. Bradshaw did not reply to Officer Griffin with whom he had had a long and mostly friendly relationship. Rather than reply, Mr. Bradshaw looked away and turned to a "blading" position; that is, turned his profile to conceal his right side from the officers' view. Three other young men who Griffin recognized as members of the Lucerne Street gang then appeared on the scene.

While Trooper Richardson went to speak to the three young men, Griffin and Ross left their cruiser and approached Mr. Bradshaw. They were very candid in their

testimony that nothing of an additionally suspicious nature occurred in the interim. The officers left their cruiser firmly convinced that Mr. Bradshaw was carrying a concealed weapon and with every intention of conducting a frisk of his person.

There are two facts independent of the testimony established by the physical evidence that was admitted: first, the gun is a very heavy one, and that fact supports the officers' description of Mr. Bradshaw's awkward and unbalanced gait.

The officers estimated the weapon as five pounds in weight. I would have thought it even heavier from my own hefting of the weapon during the hearing.

Also, I do not agree that the crutch in question could not have been used by someone as support for their left arm even though it is designed for use with the right-arm. It is clumsy, but not impossible for a person to walk with the crutch under the left arm as Mr. Wortmann demonstrated during the evidentiary hearing.

So what do we have that justifies the stop and the ensuing threshold inquiry? Certainly, no one single fact, although I give the greatest weight to the officers' observations of Mr. Bradshaw's awkward gait and the unusual positioning of his right arm pinned to his side. A combination of suggestive circumstances, each of which may be innocent in and of itself, when considered, as we are required to do, in their totality, may constitute the reasonable suspicion and particularized facts that the government must show to justify a stop under *Terry v. Ohio*, 392 U.S. 1 (1968). *See United States*

*v. Sokolov*, 490 U.S. 1, 9 (1989); *United States v. Arvizu*, 534 U.S. 266, 273-274 (2002). The "innocent" circumstances that apply in this case are, first, Mr. Bradshaw's presence at night, at a late hour, in a high crime area. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000); *United States v. Trullo*, 809 F.2d 108, 111-112 (1st Cir. 1987). I give weight to the map offered by Mr. Wortmann to illustrate the pertinent neighborhood crime statistics. In *United States v. Trullo*, one of the first cases in this Circuit to discuss the significance of presence in a high crime area in assessing reasonable suspicion for a *Terry* stop, the First Circuit was willing to consider the entirety of what used to be called The Combat Zone in Boston, this was in 1987, as a high crime area. *See id.* at 112. That area was at least as large as the one that the government points to in its map of the vicinity of Lucerne Street and Norfolk Street.

A second factor that must be considered is knowledge peculiar to the officers' training and experience. *See Arvizu*, 534 U.S. at 276. I give credit to the officers' extensive experience with gang matters and firearms, as well as some weight to the ATF training that the officers had received.

Third, the court will consider the officers' personal knowledge of the defendant, and here the collective knowledge doctrine applies. *See United States v. Cook*, 277 F.3d 82, 86 (1st Cir. 2002). Thus, I impute the same knowledge to both officers of Mr. Bradshaw's reputation for criminal activity including, as I said earlier, his prior

6

involvement in violent crimes, as well as his gang affiliation. This is not a suspected gang affiliation, but a known gang affiliation on Mr. Bradshaw's part. The government appropriately points to *United States v. Am*, 564 F.3d 25, 30 (1st Cir. 2009), as the case most on point in recognizing that weight must be given to an officer's knowledge of a suspect's gang affiliation in assessing the reasonableness of a stop and frisk.

A fourth factor that the court must look to is a suspect's innately suspicious behavior, and this is the factor to which I give the greatest weight. The case that is most instructive is *Commonwealth v. DePeiza*, 449 Mass. 367, 371 (2007), which is a Supreme Judicial Court case, where the facts were similar if not identical to the facts here; that is, a defendant attempted to hide his right side from the officers' view while walking with his arm glued rigidly to his side. The Supreme Judicial Court found the defendant's peculiar gait and posture, when considered together with his presence at a late hour in a high crime area and his nervous reaction to the officers' attempt at conversation, sufficient justification for the stop and frisk.

A fifth factor that the law directs us to consider is Mr. Bradshaw's attempt to avoid contact with police. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975). It is not a strong factor in this case, but I think it was fair for Officer Griffin to believe that someone with whom he had had cordial dealings over a sustained period of time was acting unusually, almost abnormally, in refusing to interact with him when

he attempted to start a conversation from the cruiser.

I realize that there are plausible counter explanations for each of these factors, all of which Ms. Hedges has very ably advanced in the pleadings and at the hearings, but the perspective that we must employ is the assessment that a reasonable officer would make at the scene, not the assessment that the suspect himself would make of his own behavior. *See Adams v. Williams*, 407 U.S. 143, 145-146 (1972). Thus, I find on the totality of the evidence that there was reasonable suspicion justifying the stop of Mr. Bradshaw.

The frisk presents a separate issue. *Terry* makes it clear that when an officer observes unusual conduct that leads him to reasonably conclude in light of his training and experience that criminal activity is afoot, and that the person that he is observing may be armed and dangerous, he is entitled for the protection of himself and others to conduct a limited search of the person's outer clothing in an attempt to discover a hidden weapon. *Terry v. Ohio*, 392 U.S. 1, 30 (1968).

For the frisk to be justified, both *Terry* conditions must be met; that is, there must be a reasonable suspicion of criminal activity, and a reasonable suspicion that the person to be stopped is armed and dangerous. *Arizona v. Johnson*, 129 S. Ct. 781, 784 (2009).

I am not quite sure that Ms. Hedges is arguing that there must also be a showing

of subjective fear on the part of the officer. If so, I do not think that the law requires as much. The law simply requires an objectively reasonable assessment by an officer that, in fact, his safety may be in danger, whether or not he is (or admits to being) in a state of fear. *See United States v. Tharpe*, 536 F.2d 1098, 1101 (5th Cir. 1976) (en banc), *reversed on other grounds by United States v. Causey*, 834 F.2d 1179 (5th Cir. 1987); *but see United States v. Lott*, 870 F.2d 778, 784 (1st Cir. 1989), *and compare State v. Kyles*, 675 N.W. 2d 449, 455 n.16 (Wis. 2009).

Here I find that because the officers had reasonable grounds for believing that Mr. Bradshaw was armed, and also in light of his criminal record and gang affiliation that he was dangerous, they were justified in conducting a frisk to protect themselves from a possible assault. Consequently, I find that the firearm was lawfully seized.

Turning to the *Miranda* issue, there are two statements that are objected to on *Miranda* grounds. The first is the easiest to resolve. *Miranda* does not apply to custody, as Chief Justice Warren taught us – it applies to *custodial interrogation*. *Miranda v. Arizona*, 384 U.S. 436, 478 (1966).

Thus, a statement volunteered by a person taken into custody that is not made in response to questioning by police is admissible whether or not *Miranda* warnings are given. *Id. See also United States v. Shea*, 150 F.3d 44, 48 (1st Cir. 1998), *recognized as abrogated on other grounds by United States v. Mojica-Baez*, 229 F.3d 292 (1st

9

Cir. 2000).

Consequently, the admissibility of the volunteered statement "I'm done," can be resolved without any resolution of the conflict over whether the officers *Mirandized* Mr. Bradshaw or not.

As to the second statement, both Officers Griffin and Ross testified that they did give Mr. Bradshaw *Miranda* warnings while waiting for the transport vehicle to arrive.

I credit that testimony, and I credit it foremost because I find the officers believable on this and other points, but I also credit it because, as Chief Justice Rehnquist observed in *Dickerson v. United States*, 530 U.S. 428, 430 (2000), in upholding the constitutional underpinning of *Miranda*, – the *Miranda* rights have become so embedded in police practice that the warnings have become virtually part of our national culture.

Officers are so instilled with the necessity of giving *Miranda* warnings that, in my experience, they often give *Miranda* warnings on occasions when they are not required to do so. Routine habit and practice is therefore a second reason to credit the officers' testimony on this point. Officers with the experience of Griffin and Ross, and with their training, would reasonably be expected to have reflexively given the *Miranda* warnings once Mr. Bradshaw was taken into custody. Therefore, I conclude that the

second statement regarding the purchase of the gun for $100 because, I think the phrase was, "It's hot out there" –

MR. WORTMANN: Exactly, "It's crazy out there."

THE COURT: Or "It's crazy out there" – I find that statement also admissible.

This may not be the most polished set of findings and rulings that you have ever encountered, but I will edit the transcript with a view of somewhat improving them, and should have it to you in a matter of days as well as a date for the trial.

All right. Thank you again, counsel. Ms. Hedges, I appreciate your passion, I appreciate the fact that both of you have a passionate regard for the Constitution and the rights it protects. I like to see that passion on the part of attorneys, and I commend you for it.

MS. HEDGES: Thank you, your Honor.

MR. WORTMANN: Thank you.

## ORDER

For the reasons stated in the edited transcript, the motion to suppress the gun and statements is <u>DENIED</u>. The Clerk will set a date for trial.

SO ORDERED.

/s/ Richard G. Stearns
_____
UNITED STATES DISTRICT JUDGE